E.D.N.Y. LBR 9004-2(c)
Hearing Date and Time:
July 22, 2009 at 9:30 am

Dennis Houdek, Esq.
305 Broadway, Seventh Floor
New York, New York  10007
(212) 822-1470

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
In Re:

                                                    Chapter 11

**CHANA TAUB,**                              Case No. 1-08-44210-ess

                                   Debtor.
--------------------------------------------------------------------X

### BRIEF OF DEBTOR IN OPPOSITION TO SIMON TAUB'S LIFT STAY MOTION

The Debtor and  Debtor-in-Possession  Chana Taub ("Debtor" hereinafter), by her

attorney, Dennis Houdek, Esq., respectfully submits  this Brief in opposition to the

motion of  Simon Taub to lift the stay herein.

In an effort to reduce the burden on this Court, neither this Brief nor the

accompanying  Affirmation of Dennis Houdek, Esq. will duplicate unnecessarily as

Exhibits documents that are available on-line as part of this Court's file, as this Court

can and must take judicial notice of the contents of its own file.  See, e.g., Federal

Rule of Evidence 202, made applicable to Bankruptcy Courts by Federal Rule of

Evidence 101; In re Aerial Transit Co., 190 Bankr. 464 (Bankr. S.D. Fla. 1990)

(judicial notice should be taken so as not to "grind the same corn twice"); In re Applin,

108 Bankr. 253 (Bankr. E.D. Cal. 1989) (judicial notice of "basic filings" in

bankruptcy proceeding).

This Brief will (i) first discuss the background of the state court actions that led to the filing of this emergency, <u>pro se</u> Chapter 11 petition on July 1, 2008; (ii) then discuss a brief overview of the law applicable to that background; before (iii) turning to the arguments made in Simon Taub's motion papers;  before (iv) discussing more detail  the law applicable to those arguments.

**<u>The Fractured State Court Proceedings that Led to this Chapter 11 Filing</u>**

 From the very beginning the state court actions that led to this emergency, <u>pro se</u> Chapter 11 filing have been  fractured hopelessly.    On or about June 17, 2005, the Debtor plaintiff initiated a divorce action in Kings County, Supreme Court, Index Number 18748/05 ('the first divorce action") against Simon Taub which proceeded to move at a snail's pace on the issue of equitable distribution.  For example, on January 2, 2007, nearly one and one-half (1 ½)  full years after the initiation of the first divorce action, the Court announced that it would finally <u>begin</u> to consider the issue of equitable distribution, as the Court stated that it was "going to refer you to a JHO, Justice Gans…and she will make an evaluation of assets and give you orders to produce original documentation and ultimately will report on an equitable distribution …What I will do is refer you to Judge Gans or another JHO available from the matrimonial JHO area there and have that person, whoever it is, determine some of these issues and demand of you the documentation that will be necessary and appropriate".  <u>See</u> Transcript annexed as Exhibit "A" to the accompanying Affirmation of Dennis Houdek, Esq.

At the next Court date, on February 5, 2007, this already broad delegation of authority was expanded from mere equitable distribution to include all forms of support, with the Court now stating that "[i]t is my intention to send you now to Hearing

Examiner Louise Ganz to determine the child support and the interim support if necessary…I'm sure you're going to get a much more expeditious result if you let Judge Ganz determine it". Despite this advice, Simon Taub refused to let the JHO do anything more than hear and report. <u>See</u> Transcript annexed as Exhibit "B" to the accompanying Houdek Affirmation. After the Debtor was denied a divorce on May 1, 2007, Judge Demarest further fractured the matter by declaring on the record "that any claims [the debtor] has against [Simon Taub] for his conversion of rents or whatever else is in her claimed, I don't see that it should be prosecuted in the context of the matrimonial. It's a separate claim". <u>See</u> Transcipt annexed as Exhibit "C" to the Houdek Affirmation.

This failure of the Court to even consider the issue of equitable distribution during the first divorce action was at least in part due to the scorched earth litigation tactics of Simon Taub. In response to the first divorce action, Simon Taub initiated his own divorce action against the Debtor in the same court on September 20, 2005 (Index No. 28786/05), which he later withdrew. Indeed, these scorched earth litigation tactics of Simon Taub are even confirmed by his own Exhibit "H" to this motion at its page 2, paragraph 7, which recites this second, separate divorce filing by Simon Taub. In addition, he also threatened to make various transfers of marital property during the pendency of the first divorce action that forced the Debtor to commence an action in the Supreme Court, Kings County, Index Number 33365/05 against Simon Taub, 10 Grand Avenue LLC, 10 Grand Avenue Realty Inc., 10 Grand Avenue Realty LLC, Jacob Mertz, Tile Depot of N.Y.C., Inc. and John and Jane Doe seeking, <u>inter alia</u>, the annulment of various purported transfers by Simon Taub or, alternatively, the imposition of a constructive trust in the Debtor's favor on the seven (7) properties that are now before

this Court.  At the same time as this action was commenced, the Debtor  filed a Notice of

Pendency against, <u>inter alia</u>, each of the seven (7) subject properties.  All seven of the

filed Notices of Pendency were extended for three years by Order of the Supreme Court,

Kings County dated September 11, 2008, and thus do not expire until October 28, 2011.

That action, which was and is before Judge Schmidt and which was referred to and

acknowledged in Simon Taub's motion papers herein and is thus undisputed, centers on

the ownership interests of marital property <u>between the two spouses</u>,  yet was never even

acknowledged by the Court in the first divorce action, and has languished because of

Simon Taub's refusal to permit any discovery.

     The divorce action commenced by the Debtor against Defendant Simon Taub,

resulted in a March 27, 2007 jury verdict for Defendant Simon Taub denying Debtor a

divorce, and the Order dismissing the action was entered by the Court on May 1, 2007.

     This fractured nature of the state court actions did not end with the first divorce action

on May 1, 2007, but instead worsened when the Debtor thereafter immediately brought a

second divorce action, as the Court deferred all property ownership issues to another

action <u>that did not even involve a claim by one of the two spouses</u>.    During the

pendency of the First Divorce Action, on or around February 21, 2006, Pnina Kaufman

on behalf of Moshe Taub, Simon Taub's  father, commenced an action entitled <u>Moshe</u>

<u>Taub, by Pnina Kaufman and Mark Terkeltaub, his Attorneys in Fact, Cirl Hirsch, Pnina</u>

<u>Kaufman, Yaffa Bochner, Malka Marcus, Etty Grunfeld, and Mark Terkeltaub against</u>

<u>Simon Taub, Chana Taub and 10 Grand Avenue, LLC</u> in the Supreme Court of the State

of New York, Kings County, Index No. 5646/06  (the "Constructive Trust Action")

seeking the imposition of a constructive trust over, <u>inter alia</u>,  the three properties titled

solely in the name of the Debtor,   as well a property titled in the name of both the Debtor and Simon Taub, and three properties then  titled solely in the name of Simon Taub. Thus, the Constructive Trust Action involved all seven properties at issue in this bankruptcy, but it did not involve the respective claims of the spouses.

Specifically, in the Constructive Trust Action, the plaintiffs claim that Moshe Taub conveyed the subject properties to his son, Simon Taub, and his daughter-in-law Chana Taub, some jointly, some to each individually in their names, in reliance on promises purportedly made by Simon Taub and the Debtor that they would reconvey such properties to Moshe Taub on his request.  Additionally, the plaintiffs in the Constructive Trust Action claim that the Debtor has refused Moshe Taub's requests to reconvey to him the properties that she holds title to.

The Debtor filed an answer denying all allegations in the complaint filed in the Constructive Trust Action, which only involved the claim of Moshe Taub.

It is clear that Kaufman's brother, Simon Taub, orchestrated the commencement of the Constructive Trust Action as a pretext to thwart the Debtor's right and ability to collect rents generated by the properties titled in her name,   while enabling her brother, Simon Taub,  to continue to collect the monthly rents, generated by the properties then titled solely in his name, to wit, 6-8 Grand Avenue, 10 Grand Avenue, and 23-27 Grand Avenue, in the collective amount of over $194,000 a month.

It is also clear that Kaufman's brother, Simon Taub,  also orchestrated the commencement of the Constructive Trust Action in retaliation for the Debtor's starting the First Divorce Action and to deprive the Debtor of equitable distribution rights as to the properties which are the subject of the Constructive Trust Action.

The fact that Kaufman's brother, Simon Taub, is the master behind the commencement of the Constructive Trust Action, which was devised to be a litigation tactic to frustrate the Debtor's ability to collect rents generated by her properties, is evidenced by the fact that: (i) the Constructive Trust Action languished in the state court for almost two and half years (2 ½) years before the filing of the Chapter 11 Petition herein, without any discovery ever provided, and without the matter having been tried; (ii) on May 9, 2007 Kaufman's brother, Simon Taub, filed, and then on August 1, 2007 withdrew, a frivolous motion seeking to "realign the parties" to change his status in the action from being a defendant to being a plaintiff after the Court stated that it never heard of such a motion, and (iii) in April, 2008 the plaintiffs, including Kaufman, filed a motion seeking to withdraw all of the claims in the Constructive Trust Action against Simon Taub and his entity, 10 Grand Avenue, LLC, without prejudice to recommencing the action in the event that the court in the Second Divorce Action issues an order allocating the subject properties to the Debtor, and requesting that the Constructive Trust Action continue with respect to the purported claims against the Debtor concerning the Property at issue herein. This motion was also withdrawn in January 2009 after Kaufman brought an adversary proceeding (1-08-01424) against the Debtor in this Court.  See Exhibit "D" to the Houdek Affirmation.

When the Debtor's Chapter 11 Petition stayed the Constructive Trust action, Kaufman simply moved her campaign to this Court, first filing a motion to lift the automatic stay on September 17, 2008 in the main case (Docket No. 71), a scant 2 ½ months after the filing of the Petition herein, and then, on December 1, 2008, filing Adversary Proceeding No. 1-08-01424 against the Debtor (Docket No. 114 in the main

case).  This came on the heels of the October 30, 2008 transcript, in which the Court advised David Mark, Esq. that the matter could proceed expeditiously in this Court and after determining through colloquy that discovery in the Constructive Trust Action was, essentially, nowhere, as no documents had yet been exchanged.  See Docket No. 95 in the main case.

Consistent with its failure to even consider the issues of equitable distribution during the entire two (2) year life of the first divorce action,  the Court in the second divorce action deferred all property claims to the Kaufman case, which did not even involve the competing claims of the spouses, while totally ignoring the previously filed and still pending fraudulent conveyance action by the Debtor, which did involve the competing claims of the spouses.   More particularly,  on  June 1, 2007, the Court in the Second Divorce Action issued an order providing that the Debtor be allowed to collect rents and manage, inter alia,  the 14th Avenue property and the 52nd Street property (the "June 1, 2007 Order").  In the June 1, 2007 Order, Simon Taub was restrained from interfering with the Debtor's rent collections or management of these properties.  See Exhibit "E" hereto.

On October 30, 2007, the Court in the Second Divorce Action vacated its June 1, 2007 Order, stating that it would defer to Justice Knipel, who was and  is presiding over the aforesaid Constructive Trust Action by Pnina Kaufman, and would refrain   from issuing any decisions regarding the 14th Avenue and the 52nd Street Properties.   See Exhibit "F" hereto.

Thus, all decisions regarding property ownership in the state court  were to be made by a judge presiding over a (i) Pnina Kaufman constructive trust suit that does not

involve the competing claims of the spouses; (ii) in which it was conceded before this

Court on October 30, 2008 that no discovery has even begun; and (iii) which, in any

event, has now been brought to this Court by Pnina Kaufman through Adversary

Proceeding  No. 1-08-01424 because of her stated calculation that this Court will provide

a more expeditious determination of the matter than state court.

In sum, on the issue as to whether the property ownership issues at the heart of

this Chapter 11 proceeding can be resolved expeditiously in state court, the record totally

belies that claim.  Other than the above facts, <u>see also</u> Exhibit "G" to the accompanying

Affirmation of Dennis Houdek, Esq., consisting of relevant orders and transcript

excerpts, which further  show unequivocally that the proceeding below was fractured

hopelessly between Judge Knipel, who was dealing solely with ownership of the marital

properties, and Judge Demarest, who is dealing solely with issues of child support and

maintenance.    Indeed, as noted above, there is a third judge involved, Judge Schmidt,

who also is dealing with ownership issues.    Far from being capable of being resolved

expeditiously, the state court proceedings are at a virtual standstill because of these

fractured lines of authority.

Of course, it must be noted that the references to Judge Knipel were in the past tense,

herein, as that matter is now an Adversary Proceeding before <u>this Court</u>, and was brought

before this Court precisely because it would result in a speedier resolution than state

court.  Indeed, this Court should recall that Pnina Kaufman's counsel in Court recently

stated that she wanted an "immediate trial", and the Debtor consented.  In any event, the

above unequivocally shows that the practical effect of abstaining and lifting the stay

would be that the state court, instead of waiting for Judge Knipel to resolve the

constructive trust issue before proceeding to decide the equitable distribution issues,

would now be waiting for this Court  to decide the constructive trust issue, a truly

irrational result. In addition, the fraudulent transfers that are the subject of this Adversary

Proceeding are not even before state court in any forum, and these Grand Avenue

Properties were admitted to be marital property by Simon Taub in the first divorce action

(see  Exhibit "J" to the Houdek Affirmation), yet transferred fraudulently by Simon Taub

to his two daughters from a previous marriage the very day after the denial of a divorce to

the Debtor and before the commencement of her second divorce action.  See Exhibit "K"

to the Houdek Affirmation. Given the stated position of the matrimonial judge to defer

deciding equitable distribution issues until all property ownership issues are decided, this

is now a second instance in which the equitable distribution issue will be awaiting this

Court's resolution of a property ownership issue before proceeding to determine issues of

equitable distribution.

**The Ineffectual Nature of the State Court Proceedings that Led to this Bankruptcy**

What makes this Chapter 11 filing so egregious is that it is precisely

the scorched earth litigation tactics of Simon Taub himself during the pendency of the

above state court proceedings that directly led to this emergency bankruptcy filing.  It

was Simon Taub who collected the rents on the three (3) properties that went into

foreclosure in the three (3) years leading up to the emergency  filing of the Debtor's

petition herein.  It was Simon Taub who caused those three (3) properties to go into

foreclosure by his failure and/or refusal to pay the mortgages on those properties despite

his collection of the rents.  It was Simon Taub who engaged in scorched earth litigation

tactics by forcing the Debtor into this bankruptcy as a means of starving the Debtor out of

pursuing her matrimonial litigation against him—it is no coincidence that Simon Taub's

three year refusal and/or failure to pay the rent on the Debtor's properties commenced

immediately after the Debtor sued for divorce, and that the properties were always

completely current on their mortgages before the Debtor had the temerity to sue for

divorce.

      These facts of pre-petition rent diversion are not in dispute.  When the Debtor

made her first motion seeking an order directing that she be allowed to collect the rent on

the properties titled in her name,  at the first hearing on July 31, 2008 and again on

August 28, 2008 the Court inquired as to just what Simon Taub's role was,  his counsel

characterized him as a "prepetition custodian of rents", and conceded that he was

collecting the rent before the filing of the petition herein.  <u>See</u>  Docket No. 7 in

Adversary Proceeding No. 1-08-01170, consisting of the July 31, 2008 transcript, at page

20, lines 22-25; page 33, line 19 to page 32, line 1; page 67, lines 7-16; Docket No. 78 in

the main case, consisting of the August 28, 2008 transcript, at page19, line 15 to page 20,

line 10. When Simon Taub tried to argue that the Debtor should be denied the ability to

collect the rents on the properties in her own name because Simon Taub has done it in the

past and the Debtor cannot be trusted, the Court stated the obvious, <u>i.e.,</u>  that the pre-

petition rent collection and disbursement by Simon Taub was somewhat less than

exemplary since it resulted in three (3) separate foreclosure actions. <u>See</u>  July 31, 2008

transcript, Docket No. 7 in Adversary Proceeding No.1-08-01170,  at page 68, lines 1-3

and 11-13.   When the Court tried to broker a Consent Order resolving the issue of rent

collection, it collapsed under the weight of Simon Taub's overreaching demands, which

included Simon Taub dictating which debts should be paid.  The Court was moved to

observe on August 28, 2008 at page 11, lines 11-25 of the Transcript (Docket No. 78 in the main case) that Simon Taub was insisting on "a very high level of intervention in the management of the assets of a Chapter 11 debtor in possession" that was not justified "on any section of the Bankruptcy Code that I've looked at or any case that I've studied". Moreover, in addition to his counsel making the argument before this Court on the record that Simon Taub collected the rents for all but (six) 6 months of the three (3) year period leading up to the filing of this Chapter 11 case, Simon Taub's own motion papers seeking dismissal of this case, filed a mere thirty (30) days after the commencement of this Chapter 11 proceeding, conceded this point many times. See Docket No. 28 in the main case, Application for Dismissal at page 13, Paragraph 43; Exhibit "A" thereto, Debtor's Affidavit, at page 2, Paragraph 4 and pages 3-4, Paragraphs 7-8; Exhibit "C" thereto, August 29, 2005 Transcript at page 28, lines 6-11 (Court notes Simon Taub is collecting the rent and "is still responsible for paying all of the bills on all of the properties", which, of course, he failed or refused to do); Exhibit "C" thereto, January 2, 2007 transcript, at page 49, lines 11-13 (Court notes Simon Taub has been responsible for "pay[ing] all of the expenses", which, of course, he failed or refused to do); Exhibit "H" thereto, consisting of the June 1, 2007 Order of the Brooklyn Supreme Court, at its last paragraph on its first page, which orders Simon Taub to "pay the mortgage on" the 14th Avenue Property "and take and keep the premises out of foreclosure", which, of course, he failed or refused to do; Exhibit "H" thereto, supra, at the first paragraph of its page 2, which ordered Simon Taub to, inter alia, pay the mortgage on the marital home at 1405 49th Street, which, of course, he failed or refused to do.

The rent that Simon Taub has diverted from the Debtor's properties   is

staggering.  Pages 8-10  from the Debtor's January  monthly operating report (Docket

Number 154 in the main case) is a chart detailing the pre and post-petition rent that has

been diverted by Simon Taub on just the three (3) properties that are in her name.  As

noted previously, Simon Taub cannot dispute that he was collecting the rent on the

Debtor's properties for the 3 years leading up to the Chapter 11 Petition herein, as his

own counsel stated that on the record on the first hearing on this matter on July 31, 2008

that Simon Taub collected the rents on the Debtor's properties during that time, with the

Court observing that since those properties went into foreclosure during that time, he was

obviously not doing a sterling job paying the bills on those properties.  Pages 8-10 of

Docket No. 154 in the main case shows that the Debtor is (i) owed $174,673 from the

rents at 4819 14th Avenue in Brooklyn; (ii) $37,500 in rent from the Monsey property;

and (iii) $166,928.84 in rent from the property located at 1259 52nd Street in Brooklyn,

for a total of $379,101.84.

**Partial Listing of the Scorched Earth Litigation Tactics of Simon Taub in State
Court**

A partial listing of the admittedly harassing suits filed by Simon against the Debtor is as

follows. First, as noted previously, Simon Taub reacted to the Debtor's temerity in

seeking a divorce against him in 2005 by filing a second separate divorce action against

the Debtor in Brooklyn Supreme Court on September 20, 2005, Index No. 28786/05,

while the Debtor's case was active and still being litigated, rather than counterclaiming

within that suit.  Indeed, all papers filed by Simon Taub in the Debtor's divorce action

against him claimed that they had a marriage "made in heaven" and that it was a "loving"

marriage, while all papers Simon Taub filed in his separate divorce action claimed that

the Debtor somehow abused him and thus he was suing her for $5,000,0000. This

frivolous suit was withdrawn by Simon Taub on December 1, 2006, thus admitting its

baseless nature.  Of course, one look at the comparative size of the two parties, as this

Court has had had numerous occasions to observe, demonstrates the incredulous nature of

Simon Taub's allegations.

Second, Simon Taub got Malky Scharf to file a libel suit against the Debtor, Kings

Supreme Index No. 34401/06, filed on November 13, 2006.  Malky admitted in court

while on the witness stand in March 2007 that Simon Taub financed the whole libel suit.

This frivolous lawsuit, duly scheduled by the Debtor (see Docket No. 12) is clearly meant

to harass the debtor.

Third, on March 28, 2007, the very same day he was fraudulently transferring three

marital properties out of his own name to his two daughters from a previous marriage,

Simon Taub filed a petition in Brooklyn Family Court, Docket No. 0-09400-07, and was

given a Temporary  Order of Protection against the Debtor.  In his petition, Simon Taub

claimed that he was afraid that the Debtor would kill him or hire someone to kill him.  Of

course, this petition was full of lies, as he withdrew it on  July 13, 2007, a scant 3 ½

months after filing it, when he was faced with the prospect of having a hearing on his

allegations.  Of course, this withdrawal left unanswered the obvious question of what

magically happened to his deathly fears that the Debtor would kill him.  Again, just a

quick glance at the comparative physiques of the two parties puts the lie to Simon Taub's

baseless claims. See  Exhibit "H" to the Houdek Affirmation.

Fourth, on June 26, 2007 Simon Taub sued the Debtor in Brooklyn Supreme Court,

Index No. 23111/07, for libel, simply as another way to harass her.  When confronted

with this issue,  he withdrew the suit on October 30, 2007,  a scant four (4) months later,

barely enough time for the Summons to be served and issue joined. If he was actually libeled, the suit would not have been so readily abandoned.

Fifth, as was discussed in more detail above, there is the Pnina Kaufman constructive trust action that is currently before this Court as an Adversary Proceeding in which Simon Taub made the unprecedented motion in state court to realign himself with his daughter, Pnina Kaufman, leaving no doubt that he orchestrated the entire suit. See Exhibit "D" to the Houdek Affirmation.

Sixth, on July 31, 2007, Simon Taub sued the Debtor and First Meridian Mortgage, LLC, in Kings Supreme, Index No. 28205/07, baselessly claiming that the Debtor somehow took out an improper mortgage on the property located at 4823 14th Avenue in Brooklyn. The suit claimed that First Meridian may have an interest in that property, another impediment to the resolution of any equitable distribution claim, given Judge Demarest's statements that she will not rule on those issues until the property ownership issues are resolved. See Exhibit "I' to the Houdek Affirmation.

It should also be noted that Simon Taub is such a serial liar that he cannot even keep his own story straight, as illustrated by a review of the circumstances of his fraudulent transfer of the Grand Avenue Properties. On August 8, 2005, during the pendency of the First Divorce Action, he affirmed in Court papers at their page 12, Paragraph 21, that those properties were titled in the name of "10 Grand Avenue LLC", of which he was "100% shareholder". See Exhibit "J" to the Houdek Affirmation. Yet on the deeds in which he transferred those properties to his daughters from a previous marriage the very day after the Debtor's first divorce action resulted in a denial of said divorce, only Simon Taub individually is listed as the owner of these properties. See Exhibit "K" to the

Houdek Affirmation.   Moreover, this Court will recall that in the July 31, 2008 hearing before on the Debtor's emergency rent collection motion (Transcript of which is before the Court as Docket No. 7 in Adversary Proceeding 1-08-01170), the Court spent much of a 146 page transcript in a discussion of whether rents from the three (3) Grand Avenue properties would be put in escrow when, at the very end of that transcript, Simon Taub suddenly remembered that he no longer owned these properties, yet could magically represent to the Court that they would not transferred.

One need look no further to understand the motivation  for Simon Taub's scorched earth litigation campaign than the submitted Affirmation of Irvin Rosenthal, Esq. in opposition to Simon Taub's motion to compel the disclosure of privileged communications (Docket No. 120) at its Paragraph 13, where Mr. Rosenthal states that "[d]uring the entire period of my representation of the Debtor over a period of more than two (2) years I observed [Simon Taub] did everything possible to intimidate, harass and annoy Debtor", and that this behavior was "long established".    One can hardly find a more objective observer than Mr. Rosenthal, as he (i) no longer represents the Debtor; (ii) sued the Debtor in state court; and (iii) holds a judgment against the Debtor.

This observation becomes particularly salient when one looks at Simon Taub's argument  that most of the Debtor's creditors are attorneys, which as we shall see, is not the case.  Assuming for the sake of argument, however, that that is the case, Simon Taub's motion papers do not advance any argument for its implicit assumption that such creditors are somehow different from other creditors,  because there is no authority that I know of for such a startling proposition.  Moreover, Mr. Rosenthal's observation shows that it was the actions of Simon Taub himself in his "long-established" efforts to

"intimidate, harass and annoy" the Debtor that caused these debts.  Accordingly, to be the

sole cause of these debts and then turn around and try to use them against the Debtor is

the height of chutzpah.

Of course, this conduct was nothing new, as Defendant Simon Taub has a criminal

past, as he was indicted for and pled guilty in 1998 in the United States District Court for

the Eastern District of New York to insurance fraud.        Case # 0:96-cr-00548-LDW-

1.

**Events Necessitating This Emergency, Pro SeChapter 11 Filing**

It must also be repeated, albeit in abbreviated form, that this Chapter 11

proceeding was necessitated by the actions of Defendant Simon Taub, which are the

subject of the Debtor's companion Adversary Proceeding No. 1-08-01170 in this Court.

As set forth in the Complaint in that Adversary Proceeding (Docket No. 1 therein),

immediately after the Debtor had the temerity to file for divorce against the Defendant in

2005, Simon Taub intimidated and coerced Debtor's tenants to pay him their rents in the

three rent generating properties titled in her name, and he began a campaign of

misappropriating the rents from Debtor's properties, and was woefully inept and greedy

with respect to these three Rent Generating Properties.

Specifically, Simon Taub was collecting over two million dollars annually

from the rents generated by the three properties then titled solely in his name that are now

the subject of this Adversary Proceeding (collectively, "the Grand Avenue Properties"

hereinafter)  and paying all expenses to keep them viable while at the same time Simon

Taub collected and pocketed the rents generated from the three (3) rent generating

properties titled in the Debtor's name.   Simon Taub deliberately failed to pay the

expenses associated with the four properties titled in the Debtor's name, including taxes and mortgages, in order to force them into foreclosure and disrepair.

In order to prevent the loss of the properties titled in her name to foreclosure, on July 1, 2008 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United Stated Code (the "Bankruptcy Code"), and has continued in the attempted operation and management of her property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Thus, the reality is that this Chapter 11 proceeding was filed as an emergency, pro se skeleton petition a scant one hour before one of the Debtor's properties was going to be lost at an auction sale.

### Relevant Pre-Motion Proceedings in This Court

On October 30, 2008, and as noted previously, the Court also advised counsel for Pnina Kaufman, who at that time was seeking to lift the automatic stay to permit Pnina Kaufman's constructive trust action to go forward, that an adversary proceeding in this Court was the more expeditious path and that this Court often determined matters of state law. See Docket No. 95 in the main case. Of course, it defies logic that this Court entertain Kaufman's suit against the Debtor while abstaining from permitting the Debtor the right to pursue the very same relief against Simon Taub.

This Brief will now turn to a brief overview of the relevant law governing defendants' motion before turning to the contentions made in that motion.

### THE COURT HAS JURISDICTION TO DETERMINE THE EXTENT OF THE DEBTOR'S INTEREST IN THE MARITAL PROPERTY

In the Motion, Simon Taub states, without citation to legal authority, that the state court has exclusive jurisdiction to determine the extent of the Debtor's interest in the

17

marital property (the "Property Interest Issue"), and that this Court has no jurisdiction over the Property Interest Issue.  Although not stated as such, presumably Simon Taub is trying to argue that the Court is barred from resolving the Property Interest Issue on the basis of the "domestic relations exception" to the exercise of federal jurisdiction.

As recent United States Supreme Court decisions make clear, however, the domestic relations exception to federal jurisdiction is extremely narrow and interpreted only to prohibit the federal courts from issuing orders to dissolve a marriage, provide for alimony or child support.  See Marshall v. Marshall, 547 U.S. 293, 305-08 (2006); Ankenbrandt v. Richards, 504 U.S. 689, 704, 706-07 (1992). In Marshall v. Marshall, the Supreme Court held that the "probate" exception to federal jurisdiction, kin to the "domestic relations exception", should be narrowly construed.  547 U.S. 293.  In so doing, the Supreme Court expressly recognized both the jurisdiction and the competence of bankruptcy and other federal courts to entertain tort and other claims arising under state law in probate or divorce proceedings when these claims impact a simultaneous bankruptcy case. Id. The Supreme Court addressed both the probate and domestic relations exceptions to federal jurisdiction in the scope of its opinion, noting that both are judicially created doctrines that the Supreme Court has curtailed in the past.  Id. at 299.  The Court also reviewed prior decisions regarding the domestic relations exception, including Ankenbrandt v. Richards , 504 U.S. 689 (1992), and reiterated that only divorce, alimony and child custody decrees are outside the bounds of federal jurisdiction, Marshall, 547 U.S. at 305-08, none of which are at issue in the present case.  The Marshall decision therefore establishes that federal bankruptcy courts have the ability and broad jurisdiction to determine many issues regarding domestic relations and divorce law that may arise in a

bankruptcy case. To the extent that prior cases discuss a purportedly broader exception, such cases have been abrogated by <u>Marshall</u> and <u>Ankenbrandt.</u>

### THE EXERCISE OF JURISDICTION BY THE COURT OVER THE PROPERTY INTEREST ISSUE WOULD NOT INTERFERE WITH THE DIVORCE PROCEEDING

The transcripts attached as Exhibit "G" to the Houdek Affirmation   make clear that the judge presiding over the divorce proceeding, Judge Demarest ("the Divorce Judge"), is not a family court judge, but instead is a commercial part judge who was assigned the case because of a series of refusals by prior judges.  Thus, contrary to Simon Taub's unsubstantiated statements to the contrary,  the Divorce Judge has no special expertise in the handling of divorce proceedings.

Further, the transcripts also make clear that the Divorce Judge has refused to exercise any jurisdiction over the Property Interest Issue or any issues relating to the seven real properties owned by the Debtor and/or Simon Taub (the "Marital Properties").  <u>See, e.g.</u>, Houdek Affirmation, Ex. "G"., Tr. Dated 10/30/07 at 40, lines 13-20 ("I am finished dealing with those properties until there is a ruling by my colleague Justice Knipel as to who owns the properties…I think it's inappropriate that I made any of those orders").  Judge Demarest made similar statements at the hearing on March 7, 2008.  (<u>See</u> Houdek Aff. Ex. "G", Tr. Dated 4/7/08 at 47, lines 8-16 ("Judge Knipel has the authority to decide who should be collecting the money, who should be paying the mortgage, who should be doing everything with respect to those properties….Whether the properties are owned by one or the other and who has a right to them, that's not something I'm going to decide right now, at least until there's some resolution of what's going on before Judge Knipel").  Instead, the Divorce Judge abdicated such responsibility to other state court

judges, such as Judge Knipel and Judge Schmidt, who are presiding over disputes among

the Debtor, Simon Taub and/or Pnina Kaufman relating to the Marital Properties,

including equitable distribution issues.  Of course, now that dispute is before this Court.

Accordingly, the exercise of jurisdiction by this Court over the Property Interest Issue

would not interfere with the jurisdiction of the Divorce Judge with respect to equitable

distribution issues given that the Divorce Judge has already abdicated such jurisdiction to

this Court.   Instead, the Court will properly be adjudicating an ongoing issue where all

parties with an interest in the Marital Properties are present, thus most efficiently

resolving the Property Interest Issue.

### THE COURT'S EXERCISE OF JURISDICTION OVER THE PROPERTY INTEREST ISSUE WILL ENSURE PRESERVATION OF THE DEBTOR'S ESTATE

As the Court is aware, the Debtor's interest in the Marital Properties encompasses a

majority of the Debtor's assets.  The Debtor believes that the Marital Properties are

valued in excess of $40 million (see Schedule A, Docket No. 12), and the Debtor's

interest in those properties is at least half of that amount.  Such interest will be more than

sufficient to repay all of the Debtor's creditors in full.  (See Schedules, Docket No. 12).

Accordingly, a distribution to the Debtor's creditors is conditioned upon the value of the

Marital Properties being preserved.

Based on statements made by the Divorce Judge in connection with the divorce

proceedings, the Debtor fears that the Divorce Judge will not seek to preserve the value

of the Marital Properties.  (See generally Houdek Aff. Ex. "G", Tr. dated 4/4/08).  For

example, at a hearing on April 4, 2008, the Divorce Judge said "…maybe, it is serving

the interests of the parties very well to have the papers come in and sell off the properties

at foreclosure. That is what is happening. There will come a point where we will be left

with questions of maintenance and that is it and the equitable distribution will dissolve

among itself. There won't be anything to split up". (<u>Id</u>. at 39, lines 17-25). Of course,

the reason that the Divorce Judge made this observation was that such fire sales would

conveniently moot the property ownership issues that were presently before her

"colleague Judge Knipel" and allow her to rule on the remaining equitable distribution

issues without awaiting long discovery and a trial before Judge Knipel. Foreclosures

would thus move the state court calendar by removing from it a property ownership issue

on which no discovery had been conducted and thus was a long way off, to the detriment

of the Debtor and her creditors. This Court is in the best position to ensure that the value

of the Debtor's interest in the Marital Properties is preserved for the benefit of the Debtor

and all of her creditors.

   In conclusion, this Court is not mandated to abstain from addressing the Property

Interest Issue. In fact, even permissive abstention is inappropriate because this Court is

best equipped to effectuate an efficient and expeditious adjudication of the Property

Interest Issue. It simply defies logic for this court to defer to the divorce judge or any of

the other state court judges, where the litigation is hopelessly spread out, at a standstill,

and currently awaiting <u>this Court's</u> disposition anyway.

   Accordingly, the reason for lifting the stay posited by Simon Taub, that the issue of

equitable distribution can be expeditiously resolved in state court, is completely belied by

the record herein. This Brief will, in order to avoid unnecessary duplication, not repeat

the detailed discussion of the applicable law demonstrating that this court has jurisdiction

to move forward on the two threshold issues in the Adversary Proceedings presently

before, which will go a long way toward resolving the equitable distribution issue, but will merely refer the Court to those discussions on those companion motions.

Finally, it must be noted that it cannot be disputed each of the properties that are titled in the Debtor's name have a significant equity cushion.  The Monsey house, the so-called "vacation home" whose imminent auction precipitated this Chapter 11 filing, has a market value of $500,000 and an outstanding mortgage of only $280,000.  (See Schedule A, Docket No. 12). Similarly, the house on 52nd Street in Brooklyn has no mortgage on it and has a market value of $1,500,000.  See id. The marital residence at 49th Street in Brooklyn, the subject of a pre-petition foreclosure action,  has an outstanding mortgage of $650,000 and a market value of $1,300,000.  See id. The house at 14th Avenue  in Brooklyn, also the subject of a pre-petition foreclosure action,  has an outstanding mortgage of $150,000 and a market value of $1,500,000.  See id. Thus, just the properties which are titled in the Debtor's name have a market value of $4.8 million and a total mortgage debt of $1.08 million. It is black-letter law that such an equity cushion, in and of itself, constitutes sufficient adequate protection for the mortgagee. Significantly, none of the mortgagees has made a motion to lift the stay or to seek adequate protection.  Instead, it is only Simon Taub, who may or may not even be a creditor, who is seeking to claim that the estate is somehow being diminished.

WHEREFORE, the Debtor  respectfully prays that this Court deny Simon Taub's application in its entirety and grant the Debtor  such other, further and different relief as the Court may deem just and proper.

Dated:  New York, New York
        June 23, 2009

_s/Dennis Houdek ,Esq. (DH-8466)
DENNIS HOUDEK, ESQ.
*Attorney for Debtor, Debtor-in-Possession*
*and Plaintiff Chana Taub*
305 Broadway, Seventh Floor
New York, New York 10007
(212) 822-1470